Bradley A. Benbrook (SBN 177786)
brad@benbrooklawgroup.com
Stephen M. Duvernay (SBN 250957)
steve@benbrooklawgroup.com
**BENBROOK LAW GROUP, PC**
1301 Dove Street, 5th Floor,
Newport Beach, CA 92660
Telephone: (916) 447-4900

Steven P. Lehotsky*
steve@lehotskycohn.com
Serena M. Orloff (SBN 260888)
serena@lehotskycohn.com
Jeremy Evan Maltz*
jeremy@lehotskycohn.com
**LEHOTSKY COHN LLP**
200 Massachusetts Avenue, NW,
Suite 700
Washington, DC 20001
(512) 693-8350

*Attorneys for Plaintiff NetChoice*

* *pro hac vice forthcoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **NETCHOICE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California,**<br><br>**Defendant.** | **No. __________________**<br><br>**PLAINTIFF NETCHOICE'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1. Every day, millions of Californians access social media to read the news, check in on friends, watch a lecture, join a religious service, debate politics, learn something new, or share a photograph. All of this expression is fully protected by the First Amendment. Yet California Assembly Bill 56, codified at Cal. Health & Safety Code §§ 28000-02 (the "Act"), will force a collection of these services to provide a state-authored warning about the constitutionally protected speech they publish over and over again to presumptively every user. *See* Ex. 1 (text of Act). And after the initial warning when a user first accesses a covered site on a particular day, the user cannot choose to click through or bypass the increasingly frequent subsequent warnings, no matter how many times they have seen them before. All of these warnings fundamentally block access to the underlying speech on the services. Accordingly, the Act violates bedrock constitutional protections under the First and Fourteenth Amendments.

2. The Act requires covered websites to convey the State's truncated interpretation of the U.S. Surgeon General's Advisory about social media use: "The Surgeon General has warned that while social media may have benefits for some young users, social media is associated with significant mental health harms and has not been proven safe for young users." § 28002(b).[1] The Act requires covered services to publish this warning to any user they have not verified to be over 17, each day the user accesses the service—and repeatedly throughout the day with increasing frequency. § 28002. And the Act further dictates when and for how long covered websites must communicate the State's message, whether a user can click through or bypass the message, and how prominent that communication must be—requiring the communication to cover as much as "at least 75 percent" of the screen and remain for at least 30 seconds. § 28002(a)(2)(B), (b).

[1] Unless otherwise noted, statutory citations in this Complaint refer to the California Health and Safety Code. This lawsuit challenges the Act's enactment of §§ 28000-02. Accordingly, references to the "Act" only include §§ 28000-02.

3. The one "fixed star in our constitutional constellation" is that the First Amendment prohibits the government from compelling private actors to speak the State's preferred message. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The Act does exactly that. Colorado's materially similar compelled-speech warning requirement has already been enjoined. *NetChoice v. Weiser*, 808 F. Supp. 3d 1223 (D. Colo. 2025) (requiring warning label for minor users), *appeal docketed*, No. 25-1456 (10th Cir. Dec. 9, 2025). The Court should enjoin the enforcement of this law too.

4. "In this Nation, no official . . . may command our tongues or silence our voices." *Chiles v. Salazar*, 607 U.S. 627, 640 (2026) (citation omitted); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (reaffirming that "the government may not compel a person to speak its own preferred messages"); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (the First Amendment's protections "include[] both the right to speak freely and the right to refrain from speaking at all"). And these First Amendment principles "do[] not go on leave when social media are involved." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024); *see, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) ("*Bonta*") (upholding preliminary injunction of compelled-speech requirement for websites); *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (similar).

5. The Act violates these principles many times over. California has myriad ways to speak to and persuade its residents. But the Act instead compels regulated services to speak the State's message. Although "[r]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way . . . to stigmatize and shape behavior than for the government to have to convey its views itself, [] that makes [such a law] more constitutionally offensive, not less so." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (citation omitted) ("*NAM*").

6. And it compels users to listen. Unlike a static warning on a product label, these warnings repeatedly interrupt users and block access to protected speech.

After the initial daily warning, § 28002(a)(1)(A), which users may affirmatively dismiss, users cannot turn off the warning or opt out of receiving it, § 28002(a)(2)(B), no matter how many times the user has seen the message or how irrelevant the warning is to that user and that service. The Act is designed to block, burden, and browbeat "social media" users, even as they seek to "engage in a wide array of . . . activity on topics 'as diverse as human thought.'" *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (citation omitted).

7. The Supreme Court and district courts across the Nation have recognized the constitutional problems with laws interfering with access to, and the dissemination of the fully protected speech on, these websites. *See Moody*, 603 U.S. at 744; *Packingham*, 582 U.S. at 107; *Comput. & Commc'ns Indus. Ass'n and NetChoice v. Paxton*, 184 F.4th 420 (5th Cir. 2026); *NetChoice v. Hilgers*, 2026 WL 1850018 (D. Neb. June 27, 2026); *NetChoice v. Griffin*, 831 F. Supp. 3d 816 (W.D. Ark. 2026); *NetChoice v. Jones*, 822 F. Supp. 3d 656 (E.D. Va. 2026); *NetChoice v. Murrill*, 812 F. Supp. 3d 594 (M.D. La. 2025); *NetChoice v. Griffin*, 812 F. Supp. 3d 905 (W.D. Ark. 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

8. That includes Colorado's materially similar compelled-speech warning requirement. *Weiser*, 808 F. Supp. 3d at 1240-41.

9. The Act would force a content-based and speaker-based collection of websites and applications to publish a repeated warning notification with increasing frequency to covered users and require users to receive the warning repeatedly whether they want to or not. This is designed to discourage users from accessing the covered websites, and unconstitutionally compels speech.

10. This Court should enjoin Defendant from enforcing the Act against Plaintiff NetChoice's covered members and declare the Act unlawful.

## PARTIES & STANDING

11. Plaintiff NetChoice is a District of Columbia nonprofit trade association for internet companies. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the internet, while minimizing burdens that could prevent businesses from making the internet more accessible and useful. NetChoice's members are listed at NetChoice, About Us, https://perma.cc/KD3U-R44A.

12. NetChoice has associational standing to challenge the Act because: (1) some of NetChoice's members have individual standing to sue in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge to the Act's compelled-speech requirements. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 652 n.7 (9th Cir. 2021); *see also NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025).

13. Based on the Act's central coverage provisions, §§ 27000.5, 28001, the Act regulates, at a minimum, services offered by the following NetChoice members: (1) Automattic (Tumblr); (2) Meta (Facebook, Instagram, and Threads); (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) SpaceXAI (X); (7) TikTok Inc. and TikTok USDS Joint Venture LLC (TikTok); and (8) YouTube. This Complaint refers to members with services that the Act regulates as "covered members."

14. Defendant Rob Bonta is the California Attorney General. He is a California resident and is sued in his official capacity. Defendant Bonta has authority to take action against "unfair competition," including any "unlawful" business act or practice, Cal. Bus. & Prof. Code §§ 17200, 17204, and the Act makes it unlawful for covered services to fail to display the State's mandated warnings.

## JURISDICTION & VENUE

15. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

16. Federal courts have the equitable power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

17. This Court has personal jurisdiction over Defendant because he resides in and conducts a substantial proportion of his official business in California.

18. Venue is proper in this District under 28 U.S.C. § 1391(b). Defendant regularly conducts official business in this District and at least one regulated NetChoice member is headquartered in this District and thus will suffer the effects of the Act here.

## BACKGROUND

19. NetChoice members' covered websites—like other covered social media websites—disseminate and facilitate speech that is fully protected by the First Amendment. NetChoice covered members allow users to read, watch, listen, and exchange ideas on subjects "as diverse as human thought," including politics, religion, art, science, and the ordinary interactions of daily life. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997) (citation omitted). People use these services to "gain access to information and communicate with one another." *Packingham*, 582 U.S. at 107.

20. Covered websites operate at extraordinary scale—both individually and in combination. "[S]ocial media" services disseminate and facilitate "billions of posts" of fully protected speech. *Moody*, 603 U.S. at 734. Users post text, images, audio, and video. And they also communicate by commenting, reacting, and responding on covered services many billions of times a day. Through these exchanges, high school students explore colleges and connect with athletic

recruiters. People with rare diseases find support from others who share their experiences. Users debate philosophy, politics, and literature, exchange ideas, and build communities around shared interests and experiences. Put otherwise, covered websites contain an immense amount of valuable expression on nearly every topic.

21. **California has multiple avenues to speak to—and attempt to persuade—its residents.** California has many means to speak to its residents and provide its own opinions about social media use without conscripting social media services as its mouthpiece.

22. For instance, California officials can provide public-facing information about use of the internet.

23. California officials could engage in systematic public campaigns to ensure that their opinions reach the desired audiences, as they do on many other topics. *E.g.*, Cal. Att'y Gen., Protecting Children Online, https://perma.cc/N33A-SWXX (offering various "Resources for Parents" including "Protecting Your Children's Privacy," "Getting Smart About Smartphones," "APPS," "Cyberbullying," and "Resources for Educators").

24. California could also require schools and other government entities to provide digital literacy instruction about technology and social media use. *See, e.g.*, Cal. Health & Hum. Servs. Agency, Mental Health For All, https://perma.cc/SH5Q-AZ55 (offering access to "BrightLife Kids" and the Soluna mental-health app for young people).

25. However much NetChoice and its members may disagree with the messages that California may wish to speak on its own behalf, NetChoice does not oppose the State's ability to voice its concerns. *Cf. Weiser*, 808 F. Supp. 3d at 1240 ("Colorado *did* elect to educate minors about the impacts of social media use, as shown by the [unchallenged] resource bank established by the Act."). And California does not need to do any of this alone: It can partner with any number of third parties and any number of communities to spread the State's opinion.

26. **NetChoice members voluntarily provide extensive resources to promote digital wellbeing.** NetChoice members invest heavily in tools, information, and partnerships designed to help users make informed decisions about their online experience.

27. Meta, which operates Facebook, Instagram, and Threads, has worked closely with experts, parents, guardians, and teens to develop Meta's Family Center, a central place for parents to oversee their teens' accounts within Meta technologies, set up and use supervision tools, and access conversation starters, tips, and research-backed guidance designed to support families' digital experience. Family Center is a central place for parents and guardians to access resources from leading experts and supervision tools and information about how to use them. Family Center also includes an education hub where parents and guardians can access resources from experts and review helpful articles, videos, and tips on topics like how to talk to teens about social media. Adam Mosseri, *Introducing Family Center and Parental Supervision Tools on Instagram and in VR*, Meta (Mar. 16, 2022), https://perma.cc/2EFG-FU5L. Meta also provides a Safety Center with a resource library for all users, including communities such as women, LGBTQ+, parents, teens, educators, law enforcement, journalists, activists, and public figures to discover expert-backed safety resources and tools across Meta's resources. Meta works closely with groups like ConnectSafely, the Child Mind Institute, the Digital Wellness Lab at Boston Children's Hospital, and the Trevor Project to develop resources for parents and guardians to help them have meaningful and open conversations with their teens about being online, such as the Parents Guide. Instagram, Helping your teen navigate Instagram safely, https://perma.cc/7GEL-CZRY. Meta has also built resources for teens and their parents, caregivers, and educators, working to improve digital literacy. These resources help young people navigate their time online and empower them to create the safe experiences they want. Meta, Get Digital!, https://perma.cc/K4FE-YDL9; Meta, Youth safety,

https://perma.cc/7JUZ-29LF. And Meta's Privacy Center provides resources for all users to make privacy choices that are right for them. Meta, Privacy Center, https://perma.cc/Y84U-RGA6.

28. Pinterest is the founding signatory of the Inspired Internet Pledge, created with the Boston Children's Digital Wellness Lab, which "is a call to action for tech companies and the broader digital ecosystem to unite with the common goal of making the internet a safer and healthier place for everyone, especially young people." Pinterest, The Inspired Internet Pledge, An Industry-Wide Initiative to Create a Safer and Healthier Internet (June 20, 2023), https://perma.cc/GH46-LZG7. Pinterest's Help Center also provides resources and information to parents about their teen's use of Pinterest and social media generally. Pinterest, Help Center: Resources for Parents and Caregivers of Teens, https://perma.cc/G6Q8-WSFL. Pinterest notes that "[t]hrough expert research, we've found that spending time on Pinterest improves young people's emotional wellbeing," and links to a study conducted with the University of California, Berkeley, on the power of inspirational content. *Id.*

29. In its "Mental Health and Support Resources" page, Reddit offers links to resources for users struggling with thoughts of self-harm, eating disorders, domestic abuse, sexual violence, and substance abuse. Reddit, Mental Health and Support Resources, https://perma.cc/ZHB5-NCEK.

30. TikTok offers a variety of tools and information to help users of all ages manage their experience on the platform. It provides tools to help an individual manage their platform experience, including the ability to set daily screen time limits and breaks and to review a screen time dashboard. Notably, while all users can set screen time limits, they are set to one hour by default for 13-17 year olds (parents can also manage their teens' screen time through Family Pairing). TikTok Support, Screen time (Apr. 24, 2026), https://perma.cc/P7Q4-MMHJ. Among other things, TikTok offers a Time and Well-being Page, a dedicated in-app space designed to help

users unwind, reset, and cultivate balanced digital habits. It offers advice on how to assess digital well-being, tips for reflecting on screentime, and resources for distressed community members. TikTok has also introduced "Well-being Missions," "a series of short, engaging missions designed to help people develop long-term balanced digital habits." TikTok, New Ways We're Helping Our Community Build Balanced Digital Habits (July 30, 2025), https://perma.cc/RF9L-853J. Finally, TikTok offers a Safety Center and a Teen Safety Center that are accessible both through the app and via browser. These hubs help users with managing interactions (including setting an account to private, blocking/muting other users, and reporting accounts or content that violates TikTok's Community Guidelines). The centers also provide support resources for suicide and self-harm, substance abuse, gambling, sexual abuse, and bullying prevention. TikTok, Safety Center, https://perma.cc/M3S6-ADPB; TikTok, Teen Safety Center, https://perma.cc/F69U-UMXH.

31. YouTube provides "tools and resources" to parents of teens "to help" parents manage teens' "experience on YouTube" and answer questions "about their teen's behavior and wellbeing online." YouTube Help, Tips and Resources for Parents of Teens on YouTube, https://perma.cc/J8AL-DPAZ. These resources include YouTube's "Family Guide to Teen Content Creation" and various Family Guides on topics from safety to wellbeing. *Id.*

32. **Existing options for parental control and oversight.** Parents have many existing and diverse choices to regulate and oversee whether and how their minor children use the internet.

33. There are resources that collect all these parental tools in one place. *E.g.*, Internet Matters, Parental Control Guides, https://perma.cc/VE8U-JYQG.

34. These existing market solutions allow parents to tailor their approaches to the needs of their families.

35. Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the internet.

36. Cellular and broadband internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/QF3F-LPNF; AT&T, AT&T Secure Family, https://perma.cc/XX2H-CCCB; T-Mobile, Family Controls and Privacy, https://perma.cc/2DRM-5BBS.

37. Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and unblock websites with parental controls on Firefox (Aug. 11, 2022), https://perma.cc/PG4D-DE4Z. Some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, Choose parental controls that are right for your family, https://perma.cc/A36X-X89N. Parents can also use widely available browser extensions to reinforce these tools.

38. Wireless routers often have settings allowing parents to block particular websites, filter content, monitor internet usage, and control time spent on the internet. *See, e.g.*, Netgear, Netgear Smart Parental Controls, https://perma.cc/2SAH-5WXQ.

39. Devices allow parents to limit the time their children spend on the device, block specific applications, filter content, and control privacy settings. *See* Apple, Use parental controls on your child's iPhone or iPad (May 5, 2025), https://perma.cc/RP9B-9CHH; Google Family Link, Help keep your family safer online, https://perma.cc/U6ZL-RPZH; Microsoft, Set up Microsoft Family Safety (2026), https://perma.cc/RU5A-79XH; Samsung, Manage Family groups and parental controls with your Samsung Account, https://perma.cc/GL65-VSVG; Samsung, Use Digital Wellbeing features on your Galaxy phone or tablet, https://perma.cc/D5BU-C5CV; Android Help, Manage how you spend time on your Android phone with Digital Wellbeing (2026), https://perma.cc/4VV3-DNPM.

40. Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Benedict Collins, *Best Parental Control App of 2026: Expert Testing, Ranking and Reviews*, TechRadar (Jan. 8, 2026), https://perma.cc/QL33-V3WL.

41. **Parental tools provided by NetChoice members.** In addition, NetChoice members provide parents and minors with many tools and options to help ensure that minor children are responsibly using their services.

42. Meta places teens on Facebook, Instagram, and Threads into Teen Accounts. Teen Accounts have built-in protections that limit who can contact teens, the content they see, and the time they spend. For example, with Teen Accounts, teens are, by default, placed into: daily time limit notifications after they've spent 60 minutes on Instagram; Sleep Mode, which mutes notifications overnight and sends auto-replies if someone tries to DM them; private accounts, so people who do not follow a teen cannot see their content or tag, mention, or interact with them; blocks on search terms related to certain sensitive topics like suicide, self-harm, and eating disorders; and more. Teens under 16 cannot change any of these default settings without a parent's permission. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://perma.cc/5HYG-7J4F; Meta, We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger (Apr. 8, 2025), https://perma.cc/2TAS-CNST; Instagram, About Teen Accounts on Threads, https://perma.cc/9WHC-RD3L. Further, parents and guardians can use supervision tools on Facebook, Instagram, and Threads to set daily time limits for their teens or block use during select days and hours; set reminders to close the apps; change their teen's default settings to require a non-personalized feed and stop video and animation content from automatically playing without a deliberate user action; see the average amount of time their teen has spent on Facebook and Instagram over the last week (and the total time spent on Facebook and Instagram for each specific day

over the last week); and more. *See, e.g.*, Meta, Support Your Teen with Supervision (2026), https://perma.cc/W7AZ-KB8N.

43. Pinterest is running an experiment on reminders during the school day that remind minor users who "open the Pinterest app during the school day" to "put down [their] phone[s], pause notifications, and focus on school." Pinterest, Help Center, Resources for parents and care-givers of teens (2026), https://perma.cc/KLK6-BPTQ.

44. TikTok has a "family pairing" feature that allows parents to, among other things, set a screen time limit, filter keywords, decide whether their teen's account is private or public, turn off direct messaging, and decide who can comment on their teen's videos.

45. X defaults known minors' accounts to "protected posts." *See* X, Help Center, Information for Parents and Minor Users, https://perma.cc/3QG6-GD4G. "This means that known minors will receive a request when new people want to follow them (which they can approve or deny), that their posts will only be visible to their followers, and that their posts will only be searchable by them and their followers (i.e. they will not appear in public searches). Furthermore, once these accounts enter a date of birth that makes them under the age of 18, they will be stopped from re-entering a new date of birth." *Id.* X excludes from its recommender system "potentially harmful content." *Id.* Further, X "prohibit[s] users from promoting or encouraging suicide or self-harm," and if someone "searches for terms associated with suicide or self harm, the top search result is a notification encouraging them to reach out for help." *Id.*

46. YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and subscriptions); and (3) to choose whether to link accounts between a parent and teen. YouTube, The YouTube your kids and teens love, with the protections you want,

https://perma.cc/QEE6-2GAA. YouTube has also developed features and policies directed at promoting digital wellbeing among users. *Id.* YouTube also has a "Take a Break" feature that lets a user set a reminder to take a break while watching videos. *See* YouTube Help, Take a Break Reminder, https://perma.cc/MUH5-2PSV. This feature pauses the user's video until they dismiss it or resume playing the video and is defaulted on for minors but is available for all users.

47. **Covered websites invest heavily in content moderation and beneficial user experiences.** NetChoice's members expend vast resources to improve their services and curate the third-party speech disseminated on their websites to best ensure that it is appropriate for the community of users they seek to foster. *See* Malena Dailey, By The Numbers: What Content Social Media Removes and Why 13 (2021), https://perma.cc/276S-GZ59. Covered services like "Facebook and YouTube" "cull and organize uploaded posts" to conform with those platforms' "content-moderation policies," which "lead [them] to remove, disfavor, or label various posts based on their content." *Moody*, 603 U.S. at 719-20. Other NetChoice member websites enforce similar policies. They restrict the publication of harmful speech, such as violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. *See, e.g.*, *id.* at 735 (discussing policies about "hate speech, violent or graphic content, child safety"). In addition, many covered websites promote positive and age-appropriate speech, such as content that encourages a healthy self-image.

## CALIFORNIA ASSEMBLY BILL 56

48. Becoming enforceable January 1, 2027, the Act compels a content-based and speaker-based collection of "addictive internet-based service[s] or application[s]" to convey the government's prescribed message about highly controversial purported effects of social media use on users' mental health. And regulated services must do so in the form of burdensome notifications to all users of any age, unless the user has been reasonably determined to be over 17, at least once

every day the user accesses the service. Those warnings last longer, become larger, and appear with greater frequency the longer a user is on the site. And no matter how many times a user has seen the warnings, the services must continue to display the warnings. And unlike warning labels on product packaging, a user cannot access any of the vast quantities of protected speech these services make available without first encountering a warning and, for the recurring warnings, sitting through it for the state-specified period of time.

49. **Content-based and speaker-based "addictive internet-based service or application" central coverage definition. §§ 27000.5(b)(1), 28001(a).** The Act targets a set of disfavored websites under its "covered platform" definition, which defines the scope of covered websites based on their "content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

50. In general, the Act compels speech from services that enable and facilitate their users' communications and that use features common among online services.

51. The Act regulates "covered platform[s]," which is defined (pejoratively) as any "internet website, online service, online application, or mobile application . . . that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website, online service, online application, or mobile application." §§ 27000.5(b)(1), 28001(a).

52. A purportedly "addictive feed" is "an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device," unless one or more conditions are met. § 27000.5(a).

53. Through the statute's coverage provisions, the Act singles out a subset of the "kinds" of "social media" websites discussed by the Supreme Court in *Moody*

and *Packingham*—namely, websites that enable their users to view and engage in fully protected speech. *Moody* applied full First Amendment protection to websites that work in exactly this way. 603 U.S. at 719.

54. The Act also excludes the "kinds of websites" beyond "social[]media" for which *Moody* questioned whether a different First Amendment editorial-discretion analysis might apply. *See id.* at 718, 724-25 (discussing email, online marketplace, peer-to-peer payment, and ride-sharing services). The Act does this through its definition of "covered platform," which explicitly excludes certain services (for example, that provide email or direct messaging services, § 28001(b)) and implicitly excludes others, such as (1) teleconferencing and video conferencing; (2) reference guides; (3) interactive and virtual gaming; (4) cloud-based services; (5) information on businesses, products, or travel; (6) business communication; (7) enterprise software; (8) streaming services; (9) educational services; (10) technical support; (11) academic research; and (12) news information.

55. Nevertheless, because the Act's coverage sweeps broadly to cover all services "with an addictive feed" as a "significant part" of the service, § 27000.5(b)(1), the Attorney General could conclude that services operated by NetChoice members are regulated by the Act and that those members must therefore speak the State's message.

56. **Compelled-speech warning. § 28002.** This provision, which becomes enforceable on January 1, 2027, requires covered services to display state-authored speech in the form of a warning label at least once per day a California user accesses a regulated service (and with increasing frequency thereafter), unless the service has reasonably determined the user is over 17 years of age. These warnings must be presented as the service's own speech, because the warning is not attributed to the State. In addition, California has prescribed in minute detail what the warning must say and how it must be displayed to users.

57. Beginning on January 1, 2027, "[f]or each calendar day in which a user uses a covered platform, the covered platform shall display" the "warning described in" the Act "to the user when the user initially accesses the covered platform." § 28002(a)(1)(A).

58. *Content of warning.* The state-compelled warning label "consists of the following text displayed clearly, conspicuously, and legibly in black text on a white background":

> The Surgeon General has warned that while social media may have benefits for some young users, social media is associated with significant mental health harms and has not been proven safe for young users.

§ 28002(b).

59. This provision does not attribute the warning label to the State or explain that the website is compelled to provide it; instead, it must be presented as if it were the website's own speech.

60. NetChoice's covered members would not provide the warning required by the provision if the State did not compel them to.

61. *Format and frequency of warning.* Covered websites must comply with the Act's requirements for the format and frequency of the warning—with the warning becoming larger and more frequent over time:

| **Occasion** | **Minimum Duration** | **Minimum Obstruction** |
|---|---|---|
| Initial Use | 10 seconds, unless dismissed by user | 25% of screen |
| After three hours of cumulative daily use, and once per hour thereafter | 30 seconds | 75% of screen |

62. The label must be displayed each calendar day a user uses a covered service. § 28002(a)(1)(A).

63. Upon this first display, the label should take up "at least 25 percent of the screen or window" used. § 28002(a)(1)(B).

64. The label must "be displayed clearly and continuously for a duration of at least 10 seconds, unless the user affirmatively dismisses the warning by clicking on a conspicuous 'X' icon." § 28002(a)(1)(B).

65. Then, the label must be displayed again "after three hours of cumulative active use." § 28002(a)(2)(A).

66. After those three hours, it must be displayed yet again "once per hour of cumulative active use." § 28002(a)(2)(A).

67. These subsequent warning labels "shall be displayed clearly and continuously for a duration of at least 30 seconds, without providing the ability to bypass or click through the warning, in a manner that occupies at least 75 percent of the screen or window that the user is using to access the covered platform." § 28002(a)(2)(B).

68. *Mandated audience for warnings.* Under the Act, websites must display their warning label to all users by default, unless they have "reasonably determined" the user to be over 17 years of age. § 28002(a)(1)(C), (a)(2)(C).

69. *Controversiality and non-factual nature of the warnings.* The warning mandated by the State is non-factual, controversial, and does not accurately reflect the former U.S. Surgeon General's Advisory.

70. The Act compels covered websites to speak the State's message on the highly controversial topic of purported effects of social media use on users. Those effects are the subject of intense scholarly and social debate, as well as active litigation. These are contested policy and scientific judgments dressed up as factual warnings and forced into the mouths of private speakers.

71. There is not sufficient evidence of "significant mental health harms" from "social media" use. § 28002(b).

72. Nor is it clear what it means for "social media" writ large to be "proven safe," and to whose satisfaction.

73. A literature review of the National Academies of Sciences "did not support the conclusion that social media causes changes in adolescent health at the population level." Nat'l Acads. of Scis., Eng'g & Med., Social Media and Adolescent Health 94 (2024), https://perma.cc/2QU5-363K.

74. Numerous peer-reviewed studies conclude similarly, including a "meta-analysis of 46 studies of youth social media use and mental health," which found that "the current pool of research is unable to support claims of harmful effects for social media use on youth internalizing disorders" and recommended "caution . . . when attributing mental health harm to social media use as the current evidence cannot support this." Christopher J. Ferguson et al., *There is no evidence that time spent on social media is correlated with adolescent mental health problems: Findings from a meta-analysis*, 56 Pro. Psych.: Rsch. and Prac. 73 (abstract) (Feb. 2025), https://perma.cc/NSR6-5MHG; *see id.* at 73-83.

75. Even the threshold question of what constitutes "social media" is unsettled, and the literature on its mental health effects is sharply contested. *See, e.g.*, Christopher J. Ferguson, *Do social media experiments prove a link with mental health: A methodological and meta-analytic review*, 14 Psych. Popular Media 201 (2025), https://doi.org/10.1037/ppm0000541.

76. So, even for the handful of services that have been analyzed in the existing literature, those findings are not generally applicable across distinct online services.

77. The Act's compelled warning appears to refer to the former U.S. Surgeon General's 2023 Advisory. U.S. Surgeon Gen., Advisory: Social Media and Youth Mental Health (2023), https://perma.cc/3XC4-P39G ("Advisory").

78. There is no need for covered services themselves to inform their users about the Advisory.

79. The Advisory is easily accessible online.

80. The Advisory speaks for itself.

81. The Act's one-sentence purported summation of the Advisory does not accurately, fully, completely, or uncontroversially convey the Advisory's contents.

82. Although the Act purports to acknowledge the "benefits for some young users" of social media use, that truncated clause is drowned out by the remaining warning about social media's "associat[ion] with significant mental health harms" for all users. § 28002(b).

83. For instance, the former Surgeon General noted (as have many others) the potential "benefits of social media use among children and adolescents"—including facilitating (1) "positive community and connection with others who share identities, abilities, and interests"; (2) "access to important information"; (3) "a space for self-expression"; and (4) the opportunity to "form and maintain friendships online and develop social connections." Advisory at 6. "[B]uffering effects against stress that online social support from peers may provide can be especially important for youth who are often marginalized, including racial, ethnic, and sexual and gender minorities." *Id.* Those benefits exist for adult users too.

84. Otherwise, the mandated warning does not provide any context about (1) what studies the warning references; (2) the methodology or quality of the studies; (3) the population(s) of users the studies purport to describe; (4) the magnitude of the purported links the studies purportedly find; (5) the existence of contrary studies; (6) what services the studies purport to describe; (7) how social media "is associated with significant mental health harms"; or (8) other critical information necessary for users to assess the content of the State's warning. § 28002(b).

85. The sentence the Act mandates covered websites to speak does not appear in the Surgeon General's Advisory.

86. The Advisory largely focuses on "excessive *and problematic*" use—whereas the Act's compelled warning generically warns of harms "associated with" "social media." *Compare* Advisory at 8-10, *with* § 28002(b) (emphasis added).

87. The incorporated definition of "addictive internet-based service or application" in the Act does not correspond to the definition of "social media" employed in the Advisory. *See* Advisory at 21 n.1 ("internet-based channels that allow users to opportunistically interact and selectively self-present, either in real-time or asynchronously, with both broad and narrow audiences who derive value from user-generated content and the perception of interaction with others") (citation omitted).

88. The State's mandated warning also glosses over important parts of the former U.S. Surgeon General's Advisory.

89. For instance, the Advisory concluded there are "[k]nown evidence gaps" regarding social media use and mental health:

> The relationship between social media and youth mental health is complex and potentially bidirectional. . . . Most prior research to date has been correlational, focused on young adults or adults, and generated a range of results. Critical areas of research have been proposed to fill knowledge gaps and create evidence-based interventions, resources, and tools to support youth mental health. Thus, there is an urgent need for additional research.

Advisory at 11.

90. The Act itself recognizes that the compelled warning is not properly tailored to the circumstances of individual services. Specifically, the Act provides that the "provision of the notice required by this section or a user affirmatively dismissing the notice do not waive, release, otherwise limit, *or serve as a defense to*,

any claim, *including claims premised on failure to warn*." § 28002(c) (emphases added).

91. **Enforcement and penalties.** Defendant California Attorney General has authority to enforce the Act through California's Unfair Competition Law. The Act imposes mandatory requirements on covered platforms, and a violation of those requirements constitutes an "unlawful" business practice. Cal. Bus. & Prof. Code § 17200; *see Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

92. Defendant may bring an action for injunctive relief under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17204, and may seek "a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation" of the Act, *id.* § 17206. Defendant may also seek disgorgement in addition to those remedies. Cal. Gov't Code § 12527.6(a).

**CLAIMS**

93. For its First Amendment claims, Plaintiff raises both (1) a facial challenge to the Act; and (2) an as-applied challenge to the Act "to the extent" it regulates the NetChoice covered members and services identified in ¶ 13. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).

94. The First Amendment facial-challenge and as-applied-challenge inquiries are straightforward "from the face of the law" here because, "to the extent [the Act] offends the First Amendment, it does so in the same material way across all . . . platforms subject to the provisions of the Act." *X Corp.*, 116 F.4th at 899; *Weiser*, 808 F. Supp. 3d at 1232.

**COUNT I**

**42 U.S.C. § 1983 AND FEDERAL EQUITY**

**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**

**(FACIAL AND AS-APPLIED CHALLENGES – COMPELLED SPEECH)**

95. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

96. The Act's warning notification requirements, § 28002, violate the First Amendment.

97. As incorporated against the States by the Fourteenth Amendment, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I.

98. The freedom of speech protected by the First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714; *see Moody*, 603 U.S. at 733; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988) (First Amendment protects against "compelled speech and compelled silence").

99. "[T]his general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 573 (1995).

100. The First Amendment prohibits States from compelling private entities to adopt the State's preferred message as their own *or* to publish that message. *E.g.*, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 12 (1986) (plurality op.).

101. The First Amendment bars those compulsions no "matter whether the government seeks to compel a person to speak its message when he would prefer to

remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative*, 600 U.S. at 586.

102. The Act's statutory compelled-speech requirements impose both of those burdens on the websites' freedom of speech. They compel covered websites to adopt the State's preferred message *and* to publish it to their users visiting the websites. A reasonable user would likely attribute the message to the service itself. Even if some users understand the message came from the State, the Act forces websites to convey a message they would otherwise decline to publish.

103. Much like Colorado's similar attempt to compel "social media" websites to publish warning labels, the Act's compelled-speech warning requirements trigger and fail strict First Amendment scrutiny. *E.g.*, *Weiser*, 808 F. Supp. 3d at 1234-41.

104. **The Act's compelled-speech requirements trigger strict scrutiny for two independent reasons.** The Act's compelled-speech warning notification requirements, § 28002, trigger strict scrutiny.

105. *First*, compelled-speech requirements like the Act's compelled warnings trigger strict scrutiny. *E.g.*, *Weiser*, 808 F. Supp. 3d at 1234-40.

106. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech" and thus by default triggers strict scrutiny. *Riley*, 487 U.S. at 795; *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (citations omitted); *X Corp.*, 116 F.4th at 901-02; *Weiser*, 808 F. Supp. 3d at 1235.

107. *Second*, the Act independently triggers strict scrutiny—regardless of whether the law compels or regulates commercial speech—because its speech regulation depends on a content-based and speaker-based central coverage definition for "covered platform[s]." § 28001.

108. When a law's "coverage provision" "requires consideration of [websites'] content—that is, whether their content is 'predominantly or exclusively'

socially interactive," that law is content based. *Murrill*, 812 F. Supp. 3d at 644-45 (citation modified).

109. The Act's central coverage definition is content-based because it draws lines based on the subject of the speech on a particular website.

110. The Act's central coverage definition is content-based because it singles out services that present their users with personalized feeds. §§ 27000.5(b)(1), 28001(a).

111. The Act's central coverage definition is content-based because it impliedly exempts services based on content, such as news and sports.

112. The Act distinguishes user-generated content from other kinds of content. §§ 27000.5(a)-(b)(1), 28001(a); *see Reyes*, 748 F. Supp. 3d at 1122-23. The Act discriminates based on *who* is disseminating speech, advantaging websites that have made the editorial choice to disseminate content that is not user generated, §§ 27000.5(a)-(b), 28001(a), while burdening similar websites that disseminate user-generated content. Because this speaker discrimination reflects a preference for content that is not user-generated, it triggers strict scrutiny.

113. Because the Act's central coverage definition is both content-based and speaker-based in a way that reflects a content preference, the Act's operative substantive requirements compelling speech relying on this definition are also content-based and speaker-based. *E.g.*, *Jones*, 822 F. Supp. 3d at 672; *Murrill*, 812 F. Supp. 3d at 644-45; *Reyes*, 748 F. Supp. 3d at 1120-23.

114. But even if the burden is content-neutral, the Act cannot survive intermediate scrutiny because it is overbroad and the State's interest is not "unrelated to the suppression of free speech." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

115. **The Act does not compel or regulate commercial speech.** Because the government cannot carry its burden to demonstrate that the Act's warning label is commercial speech, the Act is subject to strict scrutiny.

116. "Speech is commercial when it does no more than propose a commercial transaction." *Bonta*, 113 F.4th at 1119 (citation modified).

117. The Act's compelled-speech warnings "do not constitute commercial speech because they do far more than merely propose a commercial transaction." *Weiser*, 808 F. Supp. 3d at 1236. In fact, "the disclosures compelled by the Act require social media companies to" speak the State's preferred message about "the impacts of social media use on [users'] mental . . . health" and "such opinions . . . pertain to expressive issues of significant social, political, and scientific concern—and not matters of a commercial character." *Id.*

118. Nor is this a "close case[]" that justifies asking whether the compelled warnings contain sufficient commercial "factors" that make it "commercial speech." *Bonta*, 113 F.4th at 1119.

119. In any event, those factors are not present here. *Id.*

120. The Act's compelled warnings and the underlying content on the websites do not constitute commercial advertisements. *Id.*

121. They do not reflect an economic motive. *Id.*; *see also Weiser*, 808 F. Supp. 3d at 1236 (compelled disclosures about the safety of social media not commercial, in part because "social media platforms would presumably have an economic incentive not to provide the disclosures, as they would likely *discourage* minors from using their platforms").

122. And they do not refer to specific services. *Bonta*, 113 F.4th at 1119. In fact, the disclosures do not concern any particular website or service at all. Instead, they require warnings about the impact of social media *generally*, without reference to the alleged impact of the regulated websites' *own* services. § 28002(b).

123. Even if the Act's compelled warnings could be construed as commercial speech, they are "inextricably intertwined" with the websites' otherwise fully protected speech, so they are still subject to strict scrutiny. *See Riley*, 487 U.S. at 796. Covered websites disseminate "a staggering amount of" fully protected speech,

*Moody*, 603 U.S. at 719, including fully protected speech on a "wide array of … topics 'as diverse as human thought,'" *Packingham*, 582 U.S. at 105 (citation omitted).

124. The websites' speech does not lose full First Amendment protection, or become "commercial" speech, just because the speech is offered by for-profit entities. That websites have an economic motivation for disseminating speech is "insufficient by itself" to turn the entirety of their expressive offerings into "commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983); *see also 303 Creative*, 600 U.S. at 586; *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

125. Even if the compelled warnings were somehow construed as commercial speech, the State cannot force companies to engage in commercial speech if companies would not otherwise engage in commercial speech.

126. Even if the compelled warnings were somehow construed as commercial speech, the Act would still be subject to, at minimum, intermediate scrutiny, and it cannot pass muster under that standard.

127. ***Zauderer* does not apply.** If the Act compels or regulates commercial speech, at minimum, intermediate scrutiny would apply, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980), and not the standard of scrutiny articulated in *Zauderer v. Office of Disciplinary Counsel of Superior Court of Ohio*, 471 U.S. 626 (1985).

128. Under Supreme Court precedent, *Zauderer* review is limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010).

129. *Zauderer* review applies only to the compelled disclosure of "purely factual and uncontroversial information about the terms under which . . . services will be available." *NIFLA*, 585 U.S. at 768 (citation omitted); *see Zauderer*, 471 U.S.

at 651; *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc) (applying *Zauderer* to a "compelled disclosure accompanying [the] *related* product or service" (emphasis added)).

130. The Act's compelled-speech warning requirements "in no way relate[] to the services that" regulated websites "provide," instead relying on broad statements about some amorphous collection of "social media." *NIFLA*, 585 U.S. at 768-69.

131. The compelled warnings are not purely factual and are highly controversial, because there is "robust disagreement by reputable scientific sources" and "scientific debate" on that issue—not to mention ongoing litigation. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022); *see Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 245 n.6 (2d Cir. 2014); *Bonta*, 113 F.4th at 1120 (holding that a law requiring a covered business to opine on "how its services might expose children to harmful content online" compelled "subjective opinions" about "highly controversial issues of public concern").

132. Moreover, the warning requirements are designed to deter use of covered websites. Although "[r]equiring a company to publicly condemn itself is undoubtedly a more 'effective' way . . . to stigmatize and shape behavior than for the government to have to convey its views itself, [] that makes [such a law] more constitutionally offensive, not less so." *NAM*, 800 F.3d at 530 (citation omitted).

133. Deterring users is also "controversial" because it is "fundamentally at odds with" covered websites' missions to be open and available for users to access the wide range of protected speech available on their services. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1277-78 (9th Cir. 2023) ("*NAWG*") (citation omitted).

134. The warning notifications are not factual and are controversial for another reason: The literature on the impacts of social media is nascent and

constantly changing. A warning is "controversial" when "it elevates one side of a legitimately unresolved . . . debate." *Cal. Chamber of Com.*, 29 F.4th at 478 (citation omitted). The Court need not *resolve* this scientific debate; it only needs to determine that there *is* such a debate, and there is clearly one here. "[T]he truth of the statement[s]" about the impacts of social media is "subject to good-faith scientific or evidentiary dispute" and is an "integral part of a live, contentious political or moral debate" on social media use going on at all levels of policymaking, cultural debates, and legal challenges throughout the country. *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024), *aff'd as to another issue*, 606 U.S. 461 (2025).

135. Moreover, unlike, *e.g.*, government-mandated calorie counts on menus, the Act's required warnings address *expressive content* itself rather than traditional commercial attributes of a product. The warnings do not merely inform users about objective characteristics. Instead, they comment directly on the expressive output, and label protected speech as potentially harmful for mental health. The warnings also repeatedly block access to that speech. A calorie count leaves diners free to order. The Act's subsequent warnings force users to wait before resuming access to protected expression. So, the compelled disclosures here differ from factual, product-based disclosures in both what they say and how they obstruct access to fully protected speech.

136. Even if the Act compels only "purely factual and uncontroversial" commercial speech about the websites, *Zauderer* does not apply because the Act does not advance a "substantial governmental interest." *CTIA v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019).

137. The compelled-speech warnings do not "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz*, 559 U.S. at 250; *see also Zauderer*, 471 U.S. at 650-51

(explaining that the disclosure requirement advanced "the State's interest in preventing deception of consumers" who viewed a lawyer's "advertisement").

138. Nor do the compelled-speech warnings advance a "substantial governmental interest[]" in "protecting the health and safety of consumers" of the websites' services. *CTIA*, 928 F.3d at 845; *NAWG*, 85 F.4th at 1276 n.9 ("The position that *Zauderer* should apply in the absence of a prevention-of-deception rationale is itself controversial in this Circuit.").

139. As explained, the compelled-speech warnings do not regulate "advertisements," *Zauderer*, 471 U.S. at 650-51, or any other commercial transactions.

140. And the compelled-speech warnings provide no information about the particular website. Instead, the warning expresses only a broad statement about "social media" generally, without reference to the alleged impact of the speaker's own services. § 28002(b).

141. **The Act's compelled-speech warning requirements fail strict scrutiny and any form of First Amendment scrutiny.** The Act cannot satisfy any form of heightened First Amendment scrutiny.

142. Under strict scrutiny, Defendant must demonstrate that the Act "furthers a compelling governmental interest and is narrowly tailored to that end." *X Corp.*, 116 F.4th at 903 (citation omitted).

143. Under the First Amendment, Defendant has the burden to "specifically identify" how the Act addresses an "actual problem in need of solving" by government intervention. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (citation modified). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Id.* Here, Defendant must demonstrate that there is a problem that *requires* compelled speech—and that compelled speech is the least restrictive way to solve it.

144. Defendant cannot carry that burden.

145. California lacks a sufficient interest in forcing covered websites to say the State's preferred message on ongoing, hotly contested, scientific and political debates about social media, especially when other means are already available to achieve the same ends.

146. California lacks a sufficient interest in making covered websites present the State's opinion as the websites' own opinions, when the websites fundamentally disagree with the State's opinion.

147. Although "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power" to dictate what "ideas" or statements private parties must provide to "children." *Brown*, 564 U.S. at 794 (citation omitted).

148. And the Act's compelled-speech requirements are not the least restrictive means that the State could have used to address any legitimate concerns it may have about social media.

149. Rather than compelling covered websites to display warning notifications, California could engage in its own advocacy. As other courts have already found with respect to similar laws, California also "could have easily employed less restrictive means to accomplish its protective goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers, (2) educating children and parents on the importance of using such tools, and (3) relying on existing criminal laws that prohibit related unlawful conduct." *Bonta*, 113 F.4th at 1121.

150. California could also require schools and other government entities to provide digital literacy instruction about technology and social media use. *Cf. Weiser*, 808 F. Supp. 3d at 1240 (noting unchallenged public-education portion of Colorado law).

151. Many covered websites already include easily accessible information about safe and rewarding use of social media for users on their services and provide

options for parents and their children to ensure that minors are safely and responsibly using their services. The Supreme Court has endorsed similar "voluntary" efforts over governmental mandates. *Brown*, 564 U.S. at 803. As the Court explained, "[f]illing the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Id.*

152. Furthermore, the Act's compelled-speech requirements are simultaneously "seriously underinclusive [and] seriously overinclusive. . . . And the overbreadth in achieving one goal is not cured by the underbreadth in achieving the other." *Brown*, 564 U.S. at 805.

153. The Act is underinclusive in that it does not apply to a 17-year-old staying up until 3:00 a.m. streaming shows on Hulu, but it requires warnings when that student is watching lessons for school on YouTube. Similarly, it does not apply to a high schooler spending multiple hours on a gaming website like Roblox or Minecraft, despite the ability to interact socially on those services as well.

154. In fact, the Act seems to impose warning notifications for websites that are most likely to offer parental controls and engage in content moderation, while leaving unregulated many websites that lack such oversight. This is both underinclusive as to the unregulated websites and overinclusive as to the websites with existing parental controls and content moderation.

155. The Act is also overinclusive because it requires warning notifications for large swaths of valuable, protected, and entirely innocuous speech, without purporting to identify websites that are harmful. Likewise, it applies regardless of the user's intended use. For example, it would presumptively require warning notifications to a retiree checking neighborhood updates on Nextdoor, a teacher sharing lesson plans on Pinterest, and a college student watching a cooking tutorial on YouTube.

156. Research and history show that mandated disclosures are ineffective. Among other reasons, mandatory disclosures of information are ineffective because

of what some scholars have called "the accumulation problem"—consumers today "confront so many disclosures daily and so many consequential disclosures yearly that they could not attend to (much less master) more than a few even if they wanted to." Omri Ben-Shahar, *More Than You Wanted to Know: Failure of Mandated Disclosure*, Harv. L. Sch. F. on Corp. Governance & Fin. Regul. (May 6, 2014), https://perma.cc/9S2T-CBNP. The Act does not explain or justify how the warning-notification requirements it imposes on covered websites will be any different.

157. Even under the lower standard of intermediate scrutiny, the Act remains unconstitutional because it does not "directly and materially advanc[e] the asserted governmental interest," and it is "more extensive than necessary to serve the interests that support it." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555-56 (2001) (citation omitted).

158. **The Act's compelled-speech warning requirements are also unconstitutional because they are unduly burdensome.** At any level of First Amendment scrutiny, the Act's compelled-speech requirements are also unconstitutional because they are "unduly burdensome." *NIFLA*, 585 U.S. at 778. The Act's compelled warnings threaten to "drown[] out" the speech that covered websites otherwise present to users. *Id.*

159. The Act requires covered websites to repetitively display the State's mandated warnings throughout the day beginning when users first access the site, at sizes ranging from 25% to 75% of the page the user sees, and for durations ranging from 10 seconds to 30 seconds. § 28002(a); *see Am. Beverage Ass'n*, 916 F.3d at 757 ("the contrasting rectangular border containing a warning that covers 20% of the advertisement [would] drown out Plaintiffs' messages" (citation modified)).

160. Moreover, the Act prohibits covered websites from "providing the ability to bypass or click through" warnings after the initial daily warning. § 28002(a)(2)(B).

161. These requirements substantially interfere with covered websites' dissemination of fully protected speech on "a wide array of … topics as diverse as human thought." *Packingham*, 582 U.S. at 105 (citation omitted).

162. For this reason, too, the Act's requirements are unconstitutional regardless of what level of scrutiny applies. *NIFLA*, 585 U.S. at 778.

163. Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members of their fundamental First Amendment rights and will irreparably harm Plaintiff's members.

**COUNT II**

**EQUITABLE RELIEF**

164. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

165. Cal. Health & Safety Code §§ 28000-02 violate federal law and deprive Plaintiff and its members of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong*, 575 U.S. at 326; *Ex parte Young*, 209 U.S. 123.

166. This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing Cal. Health & Safety Code §§ 28000-02 against Plaintiff's members.

**COUNT III**

**42 U.S.C. § 1983 AND 28 U.S.C. § 2201**

**DECLARATORY RELIEF**

167. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

168. California Health & Safety Code §§ 28000-02 are unlawful and unenforceable because they violate the First Amendment to the Constitution and thereby deprive Plaintiff and its covered members of enforceable rights.

169. The compelled-warning requirements constitute the entire operative purpose of California Health & Safety Code §§ 28000-02; without them, nothing remains to sever. California Health & Safety Code §§ 28000-02 are therefore unlawful and unenforceable.

170. With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

171. This Court can and should exercise its equitable power to enter a declaration that Cal. Health & Safety Code §§ 28000-02 are unconstitutional and otherwise unlawful.

**PRAYER FOR RELIEF**

Plaintiff requests an order and judgment:

a. declaring that Cal. Health & Safety Code §§ 28000-02 are unlawful;
b. declaring that Cal. Health & Safety Code §§ 28000-02 violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment, both facially and as applied to Plaintiff's regulated members, including those identified in ¶ 13;
c. enjoining Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce Cal. Health & Safety Code §§ 28000-02 against Plaintiff's regulated members, including those identified in ¶ 13;
d. entering judgment in favor of Plaintiff;
e. awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and
f. awarding Plaintiff all other relief as the Court deems proper and just.

Dated: October 22, 2026

Respectfully submitted,


*/s/ Bradley A. Benbrook*
Bradley A. Benbrook (SBN 177786)
brad@benbrooklawgroup.com
Stephen M. Duvernay (SBN 250957)
steve@benbrooklawgroup.com
**BENBROOK LAW GROUP, PC**
1301 Dove Street, 5th Floor,
Newport Beach, CA 92660
Telephone: (916) 447-4900

Steven P. Lehotsky*
steve@lehotskycohn.com
Serena M. Orloff (SBN 260888)
serena@lehotskycohn.com
Jeremy Evan Maltz*
jeremy@lehotskycohn.com
**LEHOTSKY COHN LLP**
200 Massachusetts Avenue, NW,
Suite 700
Washington, DC 20001
(512) 693-8350

* *pro hac vice forthcoming*

*Attorneys for Plaintiff NetChoice*