Bradley A. Benbrook (SBN 177786)
brad@benbrooklawgroup.com
Stephen M. Duvernay (SBN 250957)
steve@benbrooklawgroup.com
**BENBROOK LAW GROUP, PC**
1301 Dove Street, 5th Floor,
Newport Beach, CA 92660
Telephone: (916) 447-4900

Steven P. Lehotsky*
Serena M. Orloff (SBN 260888)
Jeremy Evan Maltz*
**LEHOTSKY COHN LLP**
200 Massachusetts Avenue, NW,
Suite 700
Washington, DC 20001
(512) 693-8350
steve@lehotskycohn.com
serena@lehotskycohn.com
jeremy@lehotskycohn.com

*Attorneys for Plaintiff NetChoice*

* admitted *pro hac vice*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**NETCHOICE,**

**Plaintiff,**

**v.**

**ROB BONTA, in his official capacity as Attorney General of California,**

**Defendant.**

Case No. 2:26-cv-12370-GW-DSR

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

The Honorable George H. Wu
Date: December 14, 2026
Time: 8:30am
Location: Courtroom 9D

Complaint filed: October 22, 2026

# TABLE OF CONTENTS

Table of Authorities ........ ii
Notice of Motion and Motion ........ 1
Memorandum of Points and Authorities ........ 3
Background ........ 4
A. Factual background ........ 4
1. NetChoice members' websites disseminate and enable large amounts of fully protected speech. ........ 4
2. California has ample means to communicate its view. ........ 5
3. Private resources abound to provide users with information about social media use and to provide parents with means of overseeing their minor children online. ........ 5
B. California Assembly Bill 56 ........ 6
Argument ........ 7
I. NetChoice is likely to succeed on the merits because the Act's compelled-speech requirements violate the First Amendment. ........ 8
A. AB56's warning-notification requirement implicates the First Amendment's protections against compelled speech in every application. ........ 8
B. The Act's warning-notification requirements trigger strict First Amendment scrutiny as compelled, noncommercial speech. ........ 9
1. Compelled-speech requirements generally trigger strict scrutiny ........ 9
2. The commercial-speech doctrine does not apply to AB56's warning label. ........ 10
3. The standard of review from *Zauderer* does not apply ........ 12
C. The Act's warning-notification requirement fails strict scrutiny or any other form of heightened First Amendment scrutiny. ........ 18
1. California lacks a cognizable governmental interest in compelling covered websites to disseminate the State's speech ........ 18
2. The Act's warning notification is not properly tailored. ........ 19
3. The Act's warning labels are unduly burdensome and thus unconstitutional under any level of First Amendment scrutiny. ........ 22
D. The Act's warning requirements are both facially invalid and invalid as applied to NetChoice's regulated members. ........ 22
II. NetChoice meets all the remaining factors for a preliminary injunction. ........ 24
Conclusion ........ 25
Certificate of Compliance with Local Rule 11-6.2 ........ 26
Certificate of Service ........ 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ....................4, 8

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ....................24

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
916 F.3d 749 (9th Cir. 2019) ....................22, 24

*Am. Meat Inst. v. USDA*,
760 F.3d 18 (D.C. Cir. 2014) ....................17

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ....................10, 11

*Boos v. Barry*,
485 U.S. 312 (1988) ....................19

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ....................19, 20, 21

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) ....................15, 16, 17

*Cal. Trucking Ass'n v. Bonta*,
996 F.3d 644 (9th Cir. 2021) ....................8

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ....................7

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
447 U.S. 557 (1980) ....................12

*City & Cnty. of San Francisco v. Trump*,
783 F. Supp. 3d 1148 (N.D. Cal. 2025) ....................24

*Cmty. House, Inc. v. City of Boise*,
490 F.3d 1041 (9th Cir. 2007) ....................25

*CTIA - The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) .......... 14, 15, 17

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014) .......... 25

*Ent. Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) .......... 13

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) .......... 9, 18, 21

*Free Speech Coal., Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) .......... 15, 18

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*,
515 U.S. 557 (1995) .......... 4, 8

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) .......... 23

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018) .......... 8

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) .......... 23

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001) .......... 18, 19, 20

*McCullen v. Coakley*,
573 U.S. 464 (2014) .......... 19

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024) .......... 8, 24

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 3, 4, 8, 11, 23, 24

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) .......... 18

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) .......... 9, 13, 18, 20, 22

*NetChoice v. Griffin*,
812 F. Supp. 3d 905 (W.D. Ark. 2025) ....................4

*NetChoice v. Griffin*,
831 F. Supp. 3d 816 (W.D. Ark. 2026) ....................4

*NetChoice v. Hilgers*,
840 F. Supp. 3d 777 (D. Neb. 2026) ....................4

*NetChoice v. Jones*,
822 F. Supp. 3d 656 (E.D. Va. 2026) ....................4, 22

*NetChoice v. Murrill*,
812 F. Supp. 3d 594 (M.D. La. 2025) ....................4

*NetChoice v. Weiser*,
808 F. Supp. 3d 1223 (D. Colo. 2025) ....................3, 9, 10, 11, 12, 19, 20, 23

*NetChoice, L.L.C. v. Fitch*,
134 F.4th 799 (5th Cir. 2025) ....................8

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ....................3, 7, 9, 10, 11, 12, 13, 20

*NetChoice, LLC v. Griffin*,
2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ....................4

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024) ....................4, 20

*Nken v. Holder*,
556 U.S. 418 (2009) ....................24

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ....................3, 5, 22, 24

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
153 F.4th 795 (9th Cir. 2025) ....................14

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ....................9

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ....................9, 11

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ....................24

*S.F. Apartment Ass'n v. City & Cnty. of San Francisco*,
881 F.3d 1169 (9th Cir. 2018) ....................14

*Stuart v. Camnitz*,
774 F.3d 238 (4th Cir. 2014) ....................17

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997) ....................19

*United States v. Stevens*,
559 U.S. 460 (2010) ....................23

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ....................3

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ....................20

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ....................3, 9, 10, 11, 12, 18

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
471 U.S. 626 (1985) ....................9, 12, 13, 14, 15

**Statutes AND RULES**

Cal. Bus. & Prof. Code § 17200 ....................7

Cal. Bus. & Prof. Code § 17206 ....................7

Cal. Educ. Code § 51928 ....................5

Cal. Educ. Code § 51929 ....................5

Cal. Gov't Code § 12527.6 ....................7

Cal. Health & Safety Code § 27000.5 ....................6, 20, 21, 22

Cal. Health & Safety Code § 28001 ....................6

Cal. Health & Safety Code § 28002 ....................3, 6, 7, 10, 15, 16, 21, 22

Fed. R. Civ. P. 65 ....................24

**Other Authorities**

Cal. Att'y Gen., Protecting Children Online, https://perma.cc/836B-Z8TE ........................................5

Cal. Health & Hum. Servs. Agency, Mental Health For All, https://perma.cc/TH46-WT7T ........................................5

Christopher J. Ferguson et al., *There is no evidence that time spent on social media is correlated with adolescent mental health problems: Findings from a meta-analysis*, 56 Prof. Psych.: Rsch. & Prac. 73 (Feb. 2025), doi.org/10.1037/pro0000589 ........................................16

Omri Ben-Shahar, *More Than You Wanted to Know: Failure of Mandated Disclosure*, Harvard L. Sch. F. on Corp. Governance (May 6, 2014), https://perma.cc/5X8J-EDK2 ........................................21

Nat'l Acads. of Scis., Eng'g & Med., Social Media and Adolescent Health (2024), https://perma.cc/YNR7-AQGU ........................................16

U.S. Surgeon Gen., Social Media and Youth Mental Health, The U.S. Surgeon General's Advisory (2023), https://perma.cc/6AWD-KYPB ........................................15

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT at 8:30am on December 14, 2026, or as soon thereafter as possible, in Courtroom 9D of the Felicitas and Gonzalo Mendez United States Courthouse, 350 W 1st Street, Los Angeles, CA, 90012, Plaintiff NetChoice will and hereby does move for a preliminary injunction prohibiting Defendant from enforcing California Assembly Bill 56 (2025), Cal. Health & Safety Code §§ 28000-02 (the "Act"), against NetChoice's regulated members until this matter may be resolved on the merits. Plaintiff requests that the Court enter such injunction **before January 1, 2027**, the Act's effective date.

The motion for preliminary injunction is made on these grounds:

1. NetChoice is likely to succeed on the merits of its claim because the Act will unconstitutionally compel a group of private actors to speak the State's preferred message about the constitutionally protected speech the websites provide. The First Amendment prohibits the Act's requirements that covered websites display state-authored speech in the form of warning labels when California users access social media platforms.
2. NetChoice members face immediate and irreparable harm without an injunction—specifically, loss of their constitutional right to be free from government-compelled speech. Members' loss of their First Amendment rights constitutes irreparable harm.
3. Where, as here, the government is the object of a motion for a preliminary injunction, the public interest and equities factors merge, and both tip decisively in NetChoice's favor. NetChoice's members have an overwhelming interest in publishing the billions of posts of First-Amendment-protected speech shared on their websites every day. The government, by contrast, has no interest in enforcing an

unconstitutional law, and it is always in the public interest to protect constitutional rights.

The Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declarations; all pleadings and papers filed in this action; and such additional papers, evidence, and argument as may be presented at or in connection with the hearing.

Since NetChoice filed its complaint, NetChoice's counsel conferred with Defendant's counsel regarding litigation paths that could have obviated the need for Plaintiff NetChoice to seek preliminary injunctive relief on or before January 1, 2027. *See* Maltz Decl. ¶¶ 3-9. Those efforts were unsuccessful.

The parties have agreed to a forthcoming stipulated briefing schedule. NetChoice is available for a hearing on any date acceptable to the Court in December. And NetChoice can accommodate any briefing schedule this Court sets.

Dated: November 4, 2026

Respectfully submitted,

/s/ Bradley A. Benbrook

Bradley A. Benbrook (SBN 177786)
brad@benbrooklawgroup.com
Stephen M. Duvernay (SBN 250957)
steve@benbrooklawgroup.com
**BENBROOK LAW GROUP, PC**
1301 Dove Street, 5th Floor, Newport Beach, CA 92660
Telephone: (916) 447-4900

Steven P. Lehotsky*
steve@lehotskycohn.com
Serena M. Orloff (SBN 260888)
serena@lehotskycohn.com
Jeremy Evan Maltz*
jeremy@lehotskycohn.com
**LEHOTSKY COHN LLP**
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350

* admitted *pro hac vice*

*Attorneys for Plaintiff NetChoice*

## MEMORANDUM OF POINTS AND AUTHORITIES

California Assembly Bill 56 ("Act" or "AB56") flouts the one "fixed star in our constitutional constellation" by conscripting private websites to act as the State's mouthpieces. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). It compels social media websites to provide a state-authored warning about the protected speech on their websites to every user every day the user accesses the websites, unless a website has "reasonably determined" a user is over 17 years of age. *See* Ex. A (text of Act). And AB56 requires that those warnings become larger, last longer, and recur with increasing frequency as a user spends more time on the website—for as long as 30 seconds, covering as much as 75% of the screen. § 28002(a)(2)(B).[1] For all but the initial daily display, users cannot "dismiss" the warning, and must view it for a state-prescribed period of time before they can access the site. Worse, AB56 requires covered websites to convey the State's truncated characterization of the U.S. Surgeon General's Advisory: "The Surgeon General has warned that while social media may have benefits for some young users, social media is associated with significant mental health harms and has not been proven safe for young users." § 28002(b). Such requirements violate the First Amendment, as the District of Colorado recently held. *NetChoice v. Weiser*, 808 F. Supp. 3d 1223 (D. Colo. 2025); *see also NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121-22 (9th Cir. 2024); *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024).

"[S]ocial media" websites disseminate a "staggering amount" of speech, across "billions" of posts. *Moody v. NetChoice, LLC*, 603 U.S. 707, 716-19, 737 (2024). They allow people to "engage in a wide array of . . . activity on topics 'as diverse as human thought'"—all "protected [by the] First Amendment." *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (citation omitted). High schoolers can explore colleges and connect with athletic recruiters. People going

---

[1] Unless otherwise noted, all statutory citations are to the California Health & Safety Code.

through hardships can find support and community from others who share their experiences. And people can discuss the issues of the day from all manner of perspectives. As a result, lower courts have enjoined enforcement of laws interfering with access to, and the dissemination of content on, these kinds of websites.[2]

Fundamentally, California's law compels websites to speak when they would rather not and to convey a message with which they disagree. The "government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). So the First Amendment prohibits the government from compelling speech when a private entity "would prefer to remain silent." *Id.* (discussing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 572-73 (1995)). This Court should enjoin AB56's enforcement against NetChoice's members before the Act's January 1, 2027, effective date.

## BACKGROUND

### A. Factual background

#### 1. NetChoice members' websites disseminate and enable large amounts of fully protected speech.

NetChoice is an internet trade association, whose members have websites that are regulated by AB56: (1) Automattic (Tumblr); (2) Meta (Facebook, Instagram, and Threads); (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) SpaceXSI (X); (7) TikTok Inc. and TikTok USDS Joint Venture LLC (TikTok); and (8) YouTube. *See* Cleland Decl. ¶¶ 3-5, 25-26 ("Cleland"); Baird Decl. ¶¶ 26-27 ("Baird"); Stokka Decl. ¶¶ 27-28 ("Stokka").

These websites allow users "to share [content] with others" who can then "react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719. The

---

[2] *See NetChoice v. Hilgers*, 840 F. Supp. 3d 777 (D. Neb. 2026); *NetChoice v. Griffin*, 831 F. Supp. 3d 816 (W.D. Ark. 2026); *NetChoice v. Jones*, 822 F. Supp. 3d 656 (E.D. Va. 2026); *NetChoice v. Murrill*, 812 F. Supp. 3d 594 (M.D. La. 2025); *NetChoice v. Griffin*, 812 F. Supp. 3d 905 (W.D. Ark. 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

Supreme Court has recognized that these websites are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 582 U.S. at 107.

**2. California has ample means to communicate its view.**

California has many avenues to inform its residents about what it believes to be true about social media, many of which California already uses to communicate its views. California officials engage in systematic public campaigns to ensure that their opinions reach the desired audiences. *E.g.*, Cal. Att'y Gen., Protecting Children Online, https://perma.cc/836B-Z8TE (offering "Resources for Parents" including "Protecting Your Children's Privacy," "Getting Smart About Smartphones: Tips for Parents," "APPS," "Cyberbullying," and "Resources for Educators"). And California can require schools and other government entities to provide digital literacy instruction about technology and social media use. *See, e.g.*, California Digital Wellness Education Act, Act of Sept. 10, 2026, ch. 186 (amending Cal. Educ. Code §§ 51928-29); Cal. Health & Hum. Servs. Agency, Mental Health For All, https://perma.cc/TH46-WT7T.

**3. Private resources abound to provide users with information about social media use and to provide parents with means of overseeing their minor children online.**

Many NetChoice members provide resources to users about responsible and safe social media use and user wellbeing. They build parental controls, partner with researchers, and publish guides on digital wellbeing. Cleland ¶¶ 9-17; Baird ¶¶ 9-13, 36; Stokka ¶¶ 16-17. Diverse third parties also provide their own resources about online use. Cleland ¶¶ 19-20.

Beyond these resources, many tools exist to help adults and parents with overseeing their own and their minor children's social media use. That includes tools provided by both NetChoice members and third parties. *See* Cleland ¶¶ 18-20; Stokka ¶¶ 8-15, 18-19. NetChoice members also engage in content moderation to

address potentially harmful content on their websites. Cleland ¶ 18(c); Baird ¶¶ 10-14; Stokka ¶¶ 20-21.

**B. California Assembly Bill 56**

**1. Covered actors and activities.** AB56 regulates "covered platform[s]," which include any digital service "that offers users or provides users with an addictive feed as a significant part of the service." §§ 27000.5(b)(1), 28001(a).[3] AB56 defines an "addictive feed" as any online service, "or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." § 27000.5(a).

**2. AB56's compelled-speech mandate.** Beginning January 1, 2027, "[f]or each calendar day in which a user uses a covered platform, the covered platform shall display" the "warning described in" AB56 "to the user when the user initially accesses the covered platform." § 28002(a)(1)(A). AB56 dictates the content, format, frequency, and audience of the warning label.

*Content of warning.* The warning "consists of the following text displayed clearly, conspicuously, and legibly in black text on a white background":

> The Surgeon General has warned that while social media may have benefits for some young users, social media is associated with significant mental health harms and has not been proven safe for young users.

§ 28002(b). This warning is not explicitly attributed to the State and thus would appear to be the websites' own speech.

---

[3] NetChoice and its members disagree with the pejorative labeling of personalized feeds as "addictive."

*Format and frequency of warning.* The Act's warning must become larger, stay on the screen longer, and be displayed more frequently the longer a user is on the website per day, *see* § 28002:

| **Occasion** | **Minimum Duration** | **Minimum Obstruction** |
|---|---|---|
| Initial Use | 10 seconds, unless dismissed by user | 25% of screen |
| After three hours of cumulative daily use, and once per hour thereafter | 30 seconds, cannot be dismissed | 75% of screen |

Covered websites cannot "provid[e] the ability to bypass or click through the warning" that must be displayed after three hours of cumulative use, and hourly thereafter. § 28002(a)(2)(A)-(B).

*Mandated audience for warnings.* Websites must display the warning to all users by default, except for those users they have "reasonably determined" to be over 17. § 28002(a)(1)(C), (a)(2)(C).

**3. Enforcement**. Defendant California Attorney General Bonta has authority to enforce the Act through California's Unfair Competition Law because a violation of AB56's requirements constitutes an "unlawful" practice. Cal. Bus. & Prof. Code § 17200; *see Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Among other things, he may seek "a civil penalty not to exceed . . . ($2,500) for each violation," Cal. Bus. & Prof. Code § 17206, and disgorgement, Cal. Gov't Code § 12527.6(a).

## ARGUMENT

NetChoice satisfies the requirements for a preliminary injunction: (1) it "is likely to succeed on the merits" of its First and Fourteenth Amendment claims; (2) its members are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [NetChoice's] favor"; and (4) "an injunction is in the public interest." *Bonta*, 113 F.4th at 1115 (citation omitted).

## I. NetChoice is likely to succeed on the merits because the Act's compelled-speech requirements violate the First Amendment.

The "moving party" in First Amendment cases need only carry the "initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (citation omitted). The burden then "shifts to the government." *Id.* (citation omitted). NetChoice establishes more than a colorable First Amendment claim because the Act compels speech.[4]

### A. AB56's warning-notification requirement implicates the First Amendment's protections against compelled speech in every application.

The Act's warning requirements implicate the First Amendment's prohibitions on compelled speech in every application. The First Amendment's freedoms of speech and of the press "include[] both the right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (citation omitted).

The First Amendment's prohibitions on compelled speech are robust and broad. It does not "matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative*, 600 U.S. at 586-87 (citations omitted). Absent circumstances not present here, "this general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573. All manner of private entities have the right to be free from compelled speech—from hardware stores to book publishers to "social-media platforms." *Moody*, 603 U.S. at 719.

---

[4] NetChoice has associational standing. *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 652 n.7 (9th Cir. 2021); *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025).

Here, AB56 is facially unconstitutional because it "requires every covered social media platform to perform the same task under the Act: provide" users with state-authored warnings that—absent state compulsion—websites would not make about "the impacts of social media use on [users'] mental . . . health." *Weiser*, 808 F. Supp. 3d at 1231-32; *see* Cleland ¶¶ 30-36; Baird ¶¶ 26-35; Stokka ¶¶ 29-39. The Ninth Circuit in analogous cases has held that laws compelling speech "raise the same First Amendment issues" "in every application to a covered social media company." *X Corp.*, 116 F.4th at 899; *Bonta*, 113 F.4th at 1116; *Weiser*, 808 F. Supp. 3d at 1232.

**B. The Act's warning-notification requirements trigger strict First Amendment scrutiny as compelled, noncommercial speech.**

AB56's requirements trigger strict scrutiny because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). Content-based laws are "'presumptively unconstitutional and may be justified only if' they satisfy strict scrutiny." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025) ("*FSC*") (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

Accordingly, this case does not implicate commercial-speech intermediate scrutiny or the standard of review from *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 641 (1985).

**1. Compelled-speech requirements generally trigger strict scrutiny.**

"When a state compels individuals to speak a particular message, the state alters the content of their speech, and engages in content-based regulation." *X Corp.*, 116 F.4th at 900 (citation modified) (quoting *Riley*, 487 U.S. at 795); *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*").

Here, the Act compels speech by requiring covered websites to say—on their own websites and as if it were their own speech—"The Surgeon General has warned that while social media may have benefits for some young users, social media is

associated with significant mental health harms and has not been proven safe for young users." § 28002(b). The "disclosures compelled by the Act require social media companies to opine on the impacts of social media use on [users'] mental . . . health"—which "pertain to expressive issues of significant social, political, and scientific concern." *Weiser*, 808 F. Supp. 3d at 1236. So strict scrutiny applies. *X Corp.*, 116 F.4th at 900.

**2. The commercial-speech doctrine does not apply to AB56's warning label.**

This Court should reject any arguments that strict scrutiny does not apply. The Act's compelled warnings do not "propose a commercial transaction" or append to speech that does. *Bonta*, 113 F.4th at 1119 (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)).

At core, unlike a static warning on a product label, these warnings repeatedly block access to protected speech. After the initial daily warning, which users may dismiss, § 28002(a)(1)(A)-(B), users cannot turn off the warning or opt out of receiving it, § 28002(a)(2)(B), no matter how many times the user has seen the message or how irrelevant the warning is to that user or that website.

Even if this were a "close case," "consider[ation of] the three factors identified by the Supreme Court in *Bolger*" results in the same conclusion: (1) neither the compelled speech at issue nor the underlying content on the websites "is an advertisement," (2) "the speech [does not] refer[] to a particular product," and (3) "the speaker [does not have] an economic motivation" in presenting the warning. *Bonta*, 113 F.4th at 1119 (citation modified).

*First*, AB56 does not compel or regulate commercial advertisements. *Id.* (citation omitted); *see Weiser*, 808 F. Supp. 3d at 1236. It "targets the impacts of social media use generally—that is, it does not specifically target the commercial speech that allegedly occurs on those websites by third-party advertisers." *Weiser*, 808 F. Supp. 3d at 1239. The Act's warning is not itself an advertisement for the

websites; it is a deterrent to using those websites. Nor are websites themselves advertisements. The Supreme Court has recognized that "social media" websites disseminate "a staggering amount of content," including all manner of fully protected speech. *Moody*, 603 U.S. at 719. Whatever commercial advertisements might appear, they are "inextricably intertwined with otherwise fully protected speech" disseminated by the websites. *Riley*, 487 U.S. at 796.

*Second*, as explained in greater detail below in Part I.B.3, AB56 "require[s] businesses to go beyond opining about their products or services to opine on highly controversial issues of public concern." *Bonta*, 113 F.4th at 1120. Put otherwise, AB56 does not tie its compelled warnings to the specific website, or whatever commercial relationship exists between covered websites and their users.

*Finally*, regulated "businesses do not have a clear economic motivation to provide [California's] opinions." *Id.* Defendant cannot argue that covered websites' *general* economic motivation for their websites suffices. The fact that websites have an economic motivation for disseminating speech is "insufficient by itself" to transform their entire offerings into "commercial speech." *Bolger*, 463 U.S. at 67; *Bonta*, 113 F.4th at 1120 ("[T]hat a business may earn revenue from its services" does not "render its opinions about those services 'commercial.'"). Otherwise, "basically any compelled disclosure by any business about its activities would be commercial and subject to a lower tier of scrutiny." *X Corp.*, 116 F.4th at 902; *Weiser*, 808 F. Supp. 3d at 1236.

The Ninth Circuit has decided a pair of illustrative cases rejecting California's arguments that other requirements imposed on websites compelled or targeted mere commercial speech. *Bonta* held unconstitutional a law "requiring covered [online] businesses to opine on potential harm to children" from use of their respective websites. 113 F.4th at 1117. It concluded that strict scrutiny applied, because the requirement was "disconnected from any economic transaction." *Id.* at 1119.

*X Corp.* likewise held unconstitutional a separate law, which required websites to "detail the company's policies and actions concerning certain state-specified categories of content." 116 F.4th at 899. It concluded these requirements did not regulate or compel commercial speech, and "report[ing] whether and how [websites] believe particular, controversial categories of content should be defined and regulated on their platforms" did not qualify for lesser scrutiny. *Id.* at 901-03.

**3. The standard of review from *Zauderer* does not apply.**

Because AB56 does not compel or regulate commercial speech—and the Act's warning label is otherwise nonfactual and controversial—the *Zauderer* standard does not apply either. *See Bonta*, 113 F.4th at 1120; *X Corp.*, 116 F.4th at 900; *Weiser*, 808 F. Supp. 3d at 1239 (collecting cases).

Under Supreme Court precedent, *Zauderer* provides a narrow exception to the rule that compelled speech triggers strict scrutiny, but only when the government requires non-burdensome, "purely factual and uncontroversial" disclosures about a company's own products to cure "inherently misleading" commercial "advertisements." *Zauderer*, 471 U.S. at 641, 651 (citation omitted); *Bonta*, 113 F.4th at 1119. *Zauderer* itself permitted a compelled disclosure in attorney advertising clarifying that contingent-fee clients could be liable for legal "costs" even if they would not have to pay legal "fees": "The advertisement makes no mention of the distinction between 'legal fees' and 'costs,' and to a layman not aware of the meaning of these terms of art, the advertisement would suggest that employing appellant would . . . come entirely free of charge." *Zauderer*, 471 U.S. at 652.

As explained above, AB56 does not regulate commercial advertising. *See* Part I.B.2. But even if the Act were deemed to compel only "commercial" speech, at minimum intermediate scrutiny would apply, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 569 (1980), and not *Zauderer* scrutiny. That is

because the Act's warnings are: (1) disconnected from the regulated websites; and (2) otherwise not factual or uncontroversial. *Zauderer*, 471 U.S. at 651.

i. The Act does not qualify for *Zauderer* review because the Act's warning label "require[s] businesses to go beyond opining about their products or services to opine on highly controversial issues of public concern." *Bonta*, 113 F.4th at 1120; *see NIFLA*, 585 U.S. at 768.

The Act does not tie its compelled warnings to the specifics of any one website or common generalizable aspects of covered websites. Instead, the Act requires warnings about "social media" generally. This generic warning is one of the Act's key constitutional defects. "Social media" is not a commodifiable product like nicotine, where such generic warnings might be appropriate. *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006) (purported "impacts" of video game use are "far more opinion-based than the question of whether a particular chemical is within any given product"). Social media is *speech*. And it refers to a broad collection of websites, defined differently study-to-study, State-to-State, and family-to-family. *E.g.*, Howard Decl. ¶¶ 10-12 ("Howard"). As a result, the Surgeon General's Advisory purports to summarize scholarship that analyzes different websites—and only a fraction of the "social media" websites regulated by the Act. It necessarily does not contain information about *every* social media website regulated by the Act. *E.g.*, Cleland ¶¶ 36-38; Baird ¶¶ 38-40. And the evidence that does exist for that handful of websites is equivocal at best. *E.g.*, Cleland ¶¶ 35-38; Howard ¶¶ 16-23.

So the Act will require most covered websites to opine about the equivocal effects of *other* websites. *NIFLA*, 585 U.S. at 769 (disclosures must be "limited to . . . information about the terms under which [each covered website's] services will be available" (citation omitted)). For example, NetChoice-member Nextdoor (for which there is little research, if any) would need to explain what the scholarship says about other websites entirely. Baird ¶¶ 37-40.

Because the Act does not provide users with specific information about the websites they are actually using, the Act does not implicate *Zauderer*'s underlying interests. For instance, the Act's warnings cannot prevent "potential deception of the public." *Zauderer*, 471 U.S. at 629. A generic warning about "social media" writ large cannot correct any alleged deception about a particular website. Nor can a warning that summarizes scholarship about *other* websites dispel confusion about the website a user is actually using; if anything, attributing such findings risks *creating* confusion rather than curing it. Likewise, the Act's generic warnings cannot "further[] public health and safety." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 844 (9th Cir. 2019). The Act's warnings tell users nothing about how to use any particular website safely.

That makes this Act unlike other kinds of disclosures that the Ninth Circuit has upheld. For example, when pharmaceutical manufacturers are required to report "product-specific economic information about prescription drugs," the manufacturers report "information . . . tethered to commercial transactions" and relevant to consumers' use of that particular drug. *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 821 (9th Cir. 2025).

Similarly, when a landlord is required to provide contact information for tenants' rights organizations, the disclosure informs the consumer about "purely factual" information about a discussion that "relates solely to the economic interests of the parties." *See S.F. Apartment Ass'n v. City & Cnty. of San Francisco*, 881 F.3d 1169, 1174, 1176-78 (9th Cir. 2018). It would be another thing entirely if the landlord were required to include a message about general ways that landlords may mistreat tenants. *See id.* at 1178.

And when cell phone retailers were required to "disclose information to prospective cell phone purchasers" about the government's radiation exposure guidelines relevant to cell phone use, the retailers did not dispute whether the ordinance was "a regulation of commercial speech" but only which First

Amendment standard applied. *CTIA*, 928 F.3d at 837, 841-42. There, the disclosure was required only when a customer bought or leased a cell phone. *Id.* at 838. The First Amendment analysis would be different if a retailer were required to make the same disclosure when it was neither advertising nor proposing a commercial transaction.

ii. In addition, the compelled warnings at issue here are neither "factual" nor "uncontroversial," which also means *Zauderer* cannot apply. 471 U.S. at 651. A subject matter is "controversial" where there is "robust disagreement by reputable scientific sources" and "scientific debate" on that issue. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022). This Court need not *resolve* that debate. It need only determine that the debate exists. Because it does, the government cannot compel private entities to opine on issues "subject to good-faith scientific or evidentiary dispute" that are an "integral part of a live, contentious political or moral debate." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 281-82 (5th Cir. 2024).

In general, social media use and its purported effects on mental health are the subjects of the kind of debate that makes the Act's disclosure non-factual and "controversial" for purposes of *Zauderer*. *See* Cleland ¶¶ 35-38; Baird ¶¶ 37-40; Howard ¶¶ 13-29. Yet AB56 would require covered websites to take a side in that debate, conveying the State's view that websites full of protected speech have yet to be "proven safe for young users." § 28002(b).

In the Advisory that forms the basis of the State's warning label, the Surgeon General acknowledged that "robust" analysis of social media has "not yet been conducted" and that "[m]ore research is needed to fully understand the impact of social media." U.S. Surgeon Gen., Social Media and Youth Mental Health 4, The U.S. Surgeon General's Advisory (2023) ("Advisory"), https://perma.cc/6AWD-KYPB. The Advisory concluded it is not clear whether social media use causes purported harms, purported harms lead to social media use, or something else is

driving both. Advisory at 4, 11. Thus, the very source that the Legislature used to support the Act's compelled-speech requirement acknowledges that debate about social media use entails "robust disagreement by reputable scientific sources." *Cal. Chamber of Com.*, 29 F.4th at 478; *see* Howard ¶¶ 35-38 (discussing Advisory).

Since the Advisory, the National Academies concluded that their "review of the literature . . . did not support the conclusion that social media causes changes in adolescent health at the population level." Nat'l Acads. of Scis., Eng'g & Med., Social Media and Adolescent Health 94 (2024), https://perma.cc/YNR7-AQGU; Howard ¶¶ 19-20. Another even more recent "meta-analysis of 46 studies of youth social media use and mental health" concluded that "the current pool of research is unable to support claims of harmful effects for social media use on youth internalizing disorders" and recommended "caution . . . when attributing mental health harm to social media use as the current evidence cannot support this." Christopher J. Ferguson et al., *There is no evidence that time spent on social media is correlated with adolescent mental health problems: Findings from a meta-analysis*, 56 Prof. Psych.: Rsch. & Prac. 73 (abstract) (Feb. 2025), doi.org/10.1037/pro0000589; *id.* at 73-83; Howard ¶ 14.

The State's compelled warning elides all of those open questions. Instead, the Act would require each covered website to parrot the State's simplistic view of these complicated questions in a single, terse sentence: "while social media may have benefits for some young users, social media is associated with significant mental health harms and has not been proven safe for young users." § 28002(b). The warning label necessarily contains no information about: (1) what studies or empirical data the Surgeon General relied on; (2) the methodology of those studies; (3) the population(s) of users the warning references as "some young users"; (4) the magnitude of the effect sizes; (5) contrary authorities; (6) what websites those studies analyzed; (7) what problematic use entails; and (8) other critical information necessary for users to assess the content of the State's warning. Howard ¶ 45.

Although it would not be constitutional for California to mandate that covered websites provide a link to the Advisory itself, it is telling that California did not do so. The State's unwillingness to let its citizens draw their own conclusions about the Advisory demonstrates that the Act does not further the government's interest in "promoting efficient exchange of information." *CTIA*, 928 F.3d at 843 (citation omitted). Instead, the Act would only provide the State's side in a multi-sided and ongoing debate.

Consequently, it is no defense that the compelled warning label purportedly requires websites to disclose what the Advisory concluded. Most importantly, the Act does not factually or evenhandedly recount even the Surgeon General's findings. *Cf. id.* The text of the warning does not come from the Advisory itself; it reflects the State's *characterization*. Cleland ¶¶ 31, 36-38; Howard ¶ 40. In any event, this would amount to an argument that *any time* a government official (or anyone else) purports to find a particular conclusion, the government can compel private entities to relay the State's summary of those conclusions. *Zauderer* asks whether the proposition is factually settled and uncontroversial, not whether the disclosure accurately cites a source that supports one side of an ongoing debate subject to "robust disagreement." *Cal. Chamber of Com.*, 29 F.4th at 478.

For similar reasons, the Act compels "controversial" speech that goes beyond a "dispute about simple factual accuracy" about what any one academic source—or any subset of academic sources—says. *Am. Meat Inst. v. USDA*, 760 F.3d 18, 27 (D.C. Cir. 2014). A disclosure citing a paper claiming the earth is flat is not uncontroversial just because it accurately recounts the paper's conclusions. Even if "the words the state puts into the [speaker]'s mouth are factual" in a technical sense, "that does not divorce the speech from its moral or ideological implications." *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014). Here, the Act's warnings reflect the State's *opinion* that social media has negative impacts—a view that is subject to scientific uncertainty.

The Fifth Circuit's decision in *Free Speech Coalition* is illustrative. There, Texas required pornography websites to display "health warnings" to their users regarding pornography based on the State's view of decades of research. 95 F.4th at 279. Even assuming that the disclosures were factual, the Fifth Circuit nevertheless concluded that they were controversial, so *Zauderer* review did not apply. *Id.* at 282.

If all of that were not enough, the required notifications compel websites to engage in speech designed to deter users. That message of deterrence is "controversial," because it is "fundamentally at odds with" covered websites' missions to be open and available for all users to access the wide range of protected speech on their websites. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1277-78 (9th Cir. 2023) (citation omitted).

**C. The Act's warning-notification requirement fails strict scrutiny or any other form of heightened First Amendment scrutiny.**

Under strict scrutiny, Defendant must demonstrate that the Act "furthers a compelling governmental interest and is narrowly tailored to that end." *X Corp.*, 116 F.4th at 903 (citation omitted). The Act's warning requirement cannot satisfy this demanding standard, which "is fatal in fact absent truly extraordinary circumstances." *FSC*, 606 U.S. at 485. Even assuming that intermediate scrutiny applied, Defendant cannot demonstrate that the Act "directly and materially advanc[es] the asserted governmental interest," and "is not more extensive than necessary." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555-56 (2001) (citations omitted). Plus, the Act's compelled speech is "unjustified [and] unduly burdensome" even if *Zauderer* review applied. *NIFLA*, 585 U.S. at 778.

**1. California lacks a cognizable governmental interest in compelling covered websites to disseminate the State's speech.**

To satisfy any form of heightened First Amendment scrutiny, California must "specifically identify an actual problem in need of solving" by governmental mandate. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (citation modified);

*see Lorillard*, 533 U.S. at 555 (similar). Moreover, whatever the scrutiny, the interest it asserts must be "unrelated to the suppression of free speech." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

California cannot carry that burden. The Act makes little effort to articulate the non-speech-related government interest that it claims to be advancing. Just as warnings on cigarettes aim to reduce smoking, the warnings here serve no conceivable purpose aside from reducing social media use—speech consumption. The Act's legislative text points to nothing but content as justifying its requirements. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) (addressing the "impact" of speech is a "content-based" purpose).

**2. The Act's warning notification is not properly tailored.**

The Act is not properly tailored under any level of heightened First Amendment scrutiny.

**a.** California cannot "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests" under intermediate scrutiny. *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). It certainly cannot show that the Act is "the least restrictive means available" under strict scrutiny. *See Weiser*, 808 F. Supp. 3d at 1240.

California has many "other options at its disposal for advancing its goal of protecting the health and well-being of its children." *Id.* One option is for California to "provide[] minors with these disclosures itself." *Id.* Through its own efforts to educate the public about what it believes to be true about digital services (*supra* p.5), California has shown it is capable of conducting a "public-information campaign." *NIFLA*, 585 U.S. at 775; *accord Bonta*, 113 F.4th at 1121. California could run its own ads on television, radio, and online. California could even require schools to provide digital literacy instruction to students. *See supra* p.5. It could also "incentivize[]" third parties or "social media companies to voluntarily provide these disclosures." *Weiser*, 808 F. Supp. 3d at 1240.

At bottom, many sources provide people with information about social media use. Indeed, the State demands that websites relay the State's view of the Surgeon General's Advisory—which is an easily accessible document. Plus, many covered websites and third parties already publish information about online use, mental health, and wellbeing. *See supra* p.5. Families also have many tools available to ensure that minor children are responsibly using the internet. *See id.* Those are precisely the private alternatives that the Supreme Court has endorsed over governmental intervention; whatever "modest gap" the available resources leave open, if any, filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

**b.** Even beyond the availability of less restrictive alternatives, the Act's requirements sweep more broadly "than necessary to serve [any] interests that support" them. *Lorillard*, 533 U.S. at 555-56 (citation omitted) (intermediate scrutiny). "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). This Act does exactly that.

The Act compels speech based on a concern that *some* "excessive" uses of *some* websites *sometimes* may harm *some* younger users. But the Act broadly targets entire classes of websites where users access speech "generated or shared by [other] users"—that is, places where users speak with each other. § 27000.5(a); *e.g.*, *Reyes*, 748 F. Supp. 3d at 1129. The Supreme Court has rejected the notion that governments can penalize speech because of its "interacti[vity]." *Brown*, 564 U.S. at 798. And the State's focus on commonplace online features—personalized feeds—does little to solve this problem. § 27000.5(a). Many websites use these means of disseminating speech.

On that overbroad collection of websites, the Act requires warning notifications for overbroad swaths of valuable, protected, and entirely innocuous speech every day a user accesses the website. Likewise, it presumptively requires

warnings for *all* users on the website regardless of their intended use—despite the warning purporting to be about "some young users." § 28002(b); *see* Howard ¶¶ 41-42. The State cannot justify why covered websites must show a recent retiree a warning (every day, no less) about what the State thinks the Surgeon General thinks is true about "some young users." § 28002(b). The fact that AB56 allows websites to avoid the Act's mandates for those users they have "reasonably determined" to be over 17 does not solve the problem. § 28002(a)(1)(C), (a)(2)(C). That would just require websites to collect more data about their users—potentially up to verifying users' ages. Baird ¶¶ 41-46. "[S]ubmitting to age verification" to access protected speech is a burden on First Amendment rights. *FSC*, 606 U.S. at 483.

Nor is there any evidence that these warnings will be effective. Consumers "confront so many disclosures daily and so many consequential disclosures yearly that they could not attend to (much less master) more than a few [disclosures] even if they wanted to." Omri Ben-Shahar, *More Than You Wanted to Know: Failure of Mandated Disclosure*, Harvard L. Sch. F. on Corp. Governance (May 6, 2014), https://perma.cc/5X8J-EDK2.

**c.** The Act is also "seriously underinclusive." *Brown*, 564 U.S. at 805. The Act's central definition creates wide gaps in the State's regulatory regime. Glaringly, because the Act applies only to certain "covered platform[s]," the Act entirely excludes certain websites that use the kinds of features the Act targets: personalized feeds where content is "recommended, selected, or prioritized" based on the user. § 27000.5(a). Yet these features are commonplace online. Cleland ¶ 8; Baird ¶¶ 15-19. So the Act does not require similar warnings when users spend multiple hours on gaming websites or stream shows on Hulu. *Jones*, 822 F. Supp. 3d at 676-77.

**3. The Act's warning labels are unduly burdensome and thus unconstitutional under any level of First Amendment scrutiny.**

Separately, the Act's compelled-speech requirements are unconstitutional at any level of First Amendment scrutiny because they are "unduly burdensome." *NIFLA*, 585 U.S. at 778. The Act's compelled-speech requirements threaten to "drown[] out" the speech that covered websites present to users. *Id.*

Covered websites must display the intrusive warning labels every day a user accesses the website. § 28002(a)(1)(A). They even must display the warning hourly if a user has been on the website for more than three hours, as users might be if they are watching long-form documentaries or listening to music. § 28002(a)(2)(A). The *smallest* these labels can be is a quarter of the screen; and the *shortest* time they must be displayed is 10 seconds unless the user "affirmatively dismisses the warning by clicking on a conspicuous 'X' icon." § 28002(a)(1)(B). That option goes away entirely when the label must consume three quarters of the screen for at least 30 seconds as frequently as every hour, no matter how many times the user has seen the warning. § 28002(a)(2)(A)-(B); *see Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 757 (9th Cir. 2019) ("a warning that covers 20% of the advertisement [would] drown out Plaintiffs' messages" (citation modified)). This would substantially interfere with websites' dissemination of fully protected speech. *Packingham*, 582 U.S. at 107; *see* Stokka ¶¶ 33, 44-45.

**D. The Act's warning requirements are both facially invalid and invalid as applied to NetChoice's regulated members.**

NetChoice raises both a facial challenge to the Act and challenges to AB56 as applied to the covered members and websites listed at p.4.

**1.** The Act's "unconstitutional applications substantially outweigh its constitutional ones . . . judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723-24 (citation omitted).

This First Amendment facial-challenge inquiry "first" asks what "actors" and "activities" AB56 regulates. *Id.* at 724. NetChoice detailed the Act's scope above. *See supra* pp.6-7. Defining the Act's scope allows the Court to determine which applications of the law implicate the First Amendment. This is a question of statutory interpretation. *E.g.*, *United States v. Stevens*, 559 U.S. 460, 474 (2010) ("[T]he first step in overbreadth analysis is to construe the challenged statute." (citation omitted)).

Here, AB56 implicates (indeed, violates) the First Amendment's protections in *every* application because it compels speech. *See supra* Part.I.A. The Act's "scope and application are uniform in all material respects, irrespective of the regulated social media platforms' specific attributes." *Weiser*, 808 F. Supp. 3d at 1231. A state law requiring warning labels for books would not require plaintiffs to exhaustively catalog every book or apply the content of the warning to every individual book. Here too, California's Act applies uniformly to all covered websites, and thus does not require an individualized assessment as to any individual website.

The "next" step is "to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Moody*, 603 U.S. at 725. Here, the Act's "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. If "a plaintiff shows that a statute is content based and the government fails to show that the restriction satisfies strict scrutiny, the plaintiff prevails." *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 845 (9th Cir. 2026) (citations omitted).

**2.** The Act is also invalid as applied to members' regulated websites. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by plaintiff). Each of these covered members is precisely the "kind" of "social media" website the Supreme Court has held possesses full First Amendment rights. *Moody*, 603 U.S. at 719; *Packingham*, 582 U.S. at 105.

## II. NetChoice meets all the remaining factors for a preliminary injunction.

"[T]he likelihood of success on the merits . . . is the most important factor in the preliminary injunction analysis[,]" and "it is all the more critical 'when a plaintiff alleges a constitutional violation and injury.'" *Meinecke*, 99 F.4th at 521 (citation omitted). NetChoice satisfies the remaining factors as well.[5]

The Act will cause NetChoice's members irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). NetChoice's "colorable First Amendment claim" shows its members "will suffer irreparable harm." *Am. Beverage Ass'n*, 916 F.3d at 758. Every day that websites are forced to speak the State's preferred message, they are put to the unconstitutional choice of: (1) speaking that message, in violation of their First Amendment rights; or (2) declining to speak the State's message, risking enforcement. That is irreparable harm. Indeed, one NetChoice member will consider not allowing minors to create accounts on the website if Defendant can enforce this Act. Baird ¶ 50.

In addition to the constitutional harms, the Act also imposes compliance costs "with no guarantee of . . . recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021). Websites must expend resources to alter their websites to provide warning-notification functions. Cleland ¶ 39; Baird ¶ 49; Stokka ¶¶ 42, 46.

The final two factors—"harm to the opposing party and . . . the public interest"—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The fact that the Plaintiff has raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [NetChoice's] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th

---

[5] This Court should exercise its discretion to waive Rule 65(c)'s bond requirements. *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1203 (N.D. Cal. 2025).

Cir. 2007) (citation modified). And there is "significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (citation omitted).

## CONCLUSION

NetChoice requests that this Court enjoin Defendant from enforcing the Act against NetChoice's members before it takes effect on January 1, 2027.

Dated: November 4, 2026

Respectfully submitted,

*/s/ Bradley A. Benbrook*
Bradley A. Benbrook (SBN 177786)
brad@benbrooklawgroup.com
Stephen M. Duvernay (SBN 250957)
steve@benbrooklawgroup.com
**BENBROOK LAW GROUP, PC**
1301 Dove Street, 5th Floor, Newport Beach, CA 92660
Telephone: (916) 447-4900

Steven P. Lehotsky*
steve@lehotskycohn.com
Serena M. Orloff (SBN 260888)
serena@lehotskycohn.com
Jeremy Evan Maltz*
jeremy@lehotskycohn.com
**LEHOTSKY COHN LLP**
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350

* admitted *pro hac vice*

*Attorneys for Plaintiff NetChoice*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6.2

The undersigned counsel of record for NetChoice certifies that this memorandum of points and authorities contains 6966 words, as calculated by the word-processing program used to prepare the memorandum, and complies with the word limit prescribed by Local Rule 11-6.1.

Dated: November 4, 2026

*/s/ Bradley A. Benbrook*
Bradley A. Benbrook

## CERTIFICATE OF SERVICE

I certify that I will cause this motion to be served on Defendant via email, at the following email addresses, by agreement:

- Todd.Grabarsky@doj.ca.gov
- Nanding.Chen@doj.ca.gov
- Kristin.Liska@doj.ca.gov
- Kristen.Kido@doj.ca.gov

*/s/ Bradley A. Benbrook*
Bradley A. Benbrook